UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

GENERAL ELECTRIC CAPITAL
CORPORATION,
　　　　　　　　　　　Plaintiff,

v.

JAMES E. HAMILTON, RICHARD M.
PERLMAN, and CREATIVE
PACKAGING, INC.
　　　　　　　　　　　Defendants.

CIVIL ACTION NO. 03-CV-12429-MLW

## DEFENDANTS' RESPONSE TO LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS AND STATEMENT OF MATERIAL FACTS AS TO WHICH THERE ARE GENUINE ISSUES TO BE TRIED

Defendants James E. Hamilton, Richard M. Perlman and Creative Packaging, Inc. (collectively, the "Guarantors") respectfully submit this response to the plaintiff General Electric Capital Corporation's ("GE Capital") Rule 56.1 statement of undisputed facts.

### Response to Numbered Paragraphs of GE Capital's Rule 56.1 Statement

The Guarantors respond as follows to the numbered paragraphs of GE Capital's Rule 56.1 Statement:

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Disputed. Creative Paper agreed to a different interest rate than the rate used to determine the amount of the monthly payments under the loan schedules. Affidavit of David Porter("Porter Aff."), filed herewith, ¶¶10, 11, 13.

8. Disputed. Creative Paper agreed to a different interest rate than the rate used to determine the amount of the monthly payments under the loan schedules. Porter Aff., ¶¶10, 11, 13.

9. Undisputed.[1]

10. First sentence, undisputed. Second sentence, disputed. The parties' agreement was for repayments to be made at 5% over the five-year treasury rate. Porter Aff., ¶¶10, 11, 13.

11. Undisputed, except for the statement that the Guarantors acted "to induce Charter Financial to enter into the Loan Documents and extend the equipment financing." GE Capital has included no evidence with respect to the Guarantors' intent. According to the guaranties themselves, the Guarantors signed the guaranties because Wentworth Capital required them to do so. See Tabs E, F and G to Sorensen Aff.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Disputed. The statements in this paragraph are legal, not factual. The Guarantors do not dispute that the documents attached at Tabs E, F and G to the Sorensen Affidavit are the operative documents.

16. Undisputed.

17. Undisputed.

18. Undisputed.

**Additional information:** The term "Obligee" is a defined term. It refers only to

---

[1] All loan documentation refers to the lender as "Wentworth Capital, a division of Charter Financial, Inc." All transactions involved that division, located in New Hampshire, which later became a division of Wells Fargo. Porter Aff., ¶__.

2

Wentworth Capital. The guaranties do not provide for payment of costs or expenses incurred by any other entity. Exs. E-G to Sorensen Aff.

19. Undisputed.

**Additional information:** No funds had been advanced by October 29, 1999. The funds were not advanced until three weeks later. Sorensen Aff., ¶¶3-5.

20. Undisputed.

21. Disputed. The Guarantors cannot respond to the statement about GE Capital's state of mind at the time of its purchase of a participation interest without discovery. The documentation, however, demonstrates that GE Capital did not rely on any statements in the October 1999 Acceptance Certificate. The Participation Agreements, not included with GE Capital's summary judgment submission but attached to the Porter Affidavit as Exhibits 9 and 10, expressly recite at paragraph 4(a) that GE Capital has made its own analysis of the Debtor and the Master Loan and Security Agreement (defined as the "Participated Agreement") "independently and without reliance on the Seller."

22. Disputed. GE Capital had no right to become fiscal agent under the Participation Agreement. GE Capital has not attached that document to its summary judgment papers. The Guarantors have attached a copy to the Affidavit of David Porter. Section 3(f) of the Participation Agreements provides that GE Capital could take over as fiscal agent "[u]pon the occurrence of an event of default by Debtor" and "upon notice by [GE Capital] to [Charter]." There had been no occurrence of default by the Debtor when GE Capital says it took over as fiscal agent. Porter Aff., ¶¶18-24. Further, GE Capital

has failed to establish that it gave the requisite notice of designation of itself as fiscal agent to Charter.

23. Disputed. GE Capital acted in bad faith, attempting to force the Debtor to pay it moneys that were not owed. GE Capital forced the Debtor into bankruptcy through its improper actions. See generally, Porter Aff., ¶¶27, 28, 34, 35, 37, 38.

24. Disputed. The Debtor paid the August and September 2003 installments on time. Porter Aff., ¶36 and Ex. 12.

25. Undisputed, except that the Guarantors deny that the Debtor was in default. Porter Aff., ¶¶26, 33, 36, and Exs. 7 and 12.

26. Undisputed.

27. Undisputed.

28. Disputed. GE Capital has failed to supply any accounting or explanation of how it determines the amount owed. The Guarantors dispute that the loan was accelerated, as discussed in further detail in its legal memorandum, filed herewith, and states that the interest rate used in this calculation is incorrect. Porter Aff., ¶11, 13-15.

29. Disputed. See the Guarantors' legal memorandum.

30. Undisputed (that the amount defined by GE Capital as the "Current Obligation" has not been paid).

31. Undisputed, except that the actual agreement for the lease was made by Creative Paper, Inc. The lease documentation refers to Creative Packaging in error. Porter Aff., ¶¶39-46.

32. Undisputed.

33. Undisputed (that Creative Paper missed the September 2003 payment).

4

34. Disputed. Creative Packaging does not have, and never has had, possession of the equipment. Creative Paper has the equipment and uses it in its manufacturing process. Porter Aff., ¶¶39-40.

35. Disputed. Creative Packaging owes nothing to GE Capital under the Personal Property Lease Agreement. Porter Aff., ¶¶39-46.

## Additional Facts

1. Creative Paper, Inc. (the "Debtor") filed for protection under chapter 11 of the United States Bankruptcy Code on October 13, 2003. Porter Aff, ¶2.

2. Creative Packaging, Inc. ("Creative Packaging"), the Debtor's affiliate, is not in bankruptcy. Porter Aff., ¶3.

### Facts Concerning the Guaranties and GE Capital's Collection Conduct

3. The Debtor and Creative Packaging have their place of business in Worcester, Massachusetts. Porter Aff., ¶4.

4. The employees of Wentworth Capital, a division of Charter Financial, Inc. ("Wentworth") who dealt with the Debtor and the Guarantors in the negotiation of the loan worked at Wentworth's office in Portsmouth, New Hampshire. After Charter Financial, Inc. was acquired by Wells Fargo, the Debtor continued to deal with employees of Wells Fargo in Portsmouth. Porter Aff., ¶7.

5. Although the transaction documents state that Wentworth is a division of Charter Financial, and that Charter Financial is based in New York, no one from New York participated in any aspect of the negotiation of the loan or guaranties. Porter Aff., ¶8.

6. The negotiations for the loan and guaranties took place in Massachusetts, the closing took place in Massachusetts, the equipment used as collateral is in

5

Massachusetts, the borrower and all of its employees are in Massachusetts, and the persons involved in negotiating the loan and guaranties were in Massachusetts and New Hampshire. Porter Aff., ¶9.

7. The parties' negotiations resulted in the issuance by Wentworth of a September 28, 1999 commitment letter. That letter provided for payment of interest at a rate based on the five-year treasury rate. The five-year rate at the time of the commitment letter and at the time the funds were committed was 5.86%. The agreed rate for the loan was 5% over the five-year rate, 10.86%. Porter Aff., ¶¶10-11 and Ex. 1.

8. Wentworth required Creative Packaging and its principals, Richard M. Perlman and James E. Hamilton, to execute personal guaranties. They complied with this request. Porter Aff., ¶12; Sorensen Aff., Tabs E, F, G.

9. The monthly installment amounts provided for in the loan schedules did not incorporate the agreed rate of interest, but were determined based on a higher rate. The Debtor did not realize this at the time because the loan schedules stated only the dollar amount and not the percentage rate. Porter Aff., ¶13.

10. After the Debtor's Acting Chief Financial Officer, David Porter, discovered the discrepancy, he told Wentworth about it and asked for an explanation and for the issue to be resolved. He wrote to Wentworth about this on March 16, 2000. Porter Aff., ¶14 and Ex. 2.

11. The Debtor paid the monthly installments in the amount stated on the schedules, at the higher rate of interest, reserving the Debtor's rights with respect to this overpayment. Porter Aff., ¶15.

12. GE Capital announced to the Debtor in early 2002 that it had the right to take over from Wells Fargo as the fiscal agent on the loan and that it wanted the Debtor to cure alleged defaults. Porter Aff., ¶16.

13. GE Capital claimed that the Debtor was in default because of its alleged failure to pay late fees that it said were due on many payments between late 1999 and early 2002. Specifically, GE Capital reported that it had not received payment of its participation amount of the Debtor's monthly installments on time for four months of 2000, eleven months of 2001 and the first two months of 2002. Porter Aff., ¶17 and Ex. 3.

14. The Debtor was not in default. It had paid its monthly installments on time to Wentworth, as required by the loan documents. The payments were made by automatic bank transfer (referred to as "ACH") for the first 17 months, and then by check thereafter. (The change from ACH to check, beginning in June 2001, was made at the suggestion of Wells Fargo.) The loan documents did not require the Debtor to pay late fees if it made its payments at the time and in the manner required by the loan agreements. Porter Aff., ¶19.

15. GE Capital also claimed a default because of a missed installment for April 2001. Porter Aff., ¶21.

16. Although Creative did not pay that installment, its nonpayment was by agreement with Wells Fargo, the fiscal agent at that time, in order to help the Debtor get through a major business interruption. Porter Aff., ¶22.

17. After an April 2001 equipment failure that caused the Debtor's business to be down for 24 days, Wells Fargo agreed that the Debtor could defer payment of the loan installment for the month of April 2001. Porter Aff., ¶¶23-24 and Exs. 4 and 5.

18. Wells Fargo's agreement to defer the April 2001 payment is evidenced by its confirmation to the Debtor's independent certified public accountant that the maturity date on the loan was now November 2006. The original maturity date had been October 2006. (With a November 15, 1999 first payment, the 84th payment would be due on October 15, 2006.) Porter Aff., ¶24 and Ex. 5.

19. In a January 15, 2002 letter, GE Capital claimed, as a result of unspecified defaults, to have designated itself fiscal agent, replacing Wells Fargo. Porter Aff., ¶25 and Ex. 6.

20. The Debtor disputed this and so informed GE Capital, providing it with a copy of a schedule of payments it had made. Porter Aff., ¶26 and Ex. 7.

21. GE Capital continued to insist that the Debtor was in default, and on December 11, 2002 made demand for what it claimed was a "past due balance" in the amount of $502,195.90, comprising the April 2001 payment and $391,895.90 in late fees. Porter Aff., ¶27 and Ex. 8.

22. GE Capital continued to insist that these "late fees" must be paid, even though it did not appear to dispute that the Debtor's payments to Wells Fargo were timely. Porter Aff., ¶28.

23. The Debtor requested a copy of the participation agreement GE Capital was referring to, but GE Capital refused to produce it. It did not provide the Debtor with a copy of that agreement until after the Debtor was in bankruptcy. Porter Aff., ¶29-31.

24. GE Capital faxed copies of the two participation agreements to the Debtor's bankruptcy counsel on October 24, 2003. One relates to the November 1999 loan schedule and the other to the December 1999 loan schedule. Porter Aff., ¶31 and Exs. 9 and 10.

25. Under section 3(f) of those Participation Agreements, GE Capital is not entitled unilaterally to take over as fiscal agent and to pursue collection efforts against the Debtor unless the Debtor is in default. Porter Aff., Exs. 9 and 10.

26. The Debtor was not in default at the time GE Capital purported to take over as fiscal agent. The Debtor had paid its loan installments on time, with the exception of the April 2001 payment that Wells Fargo had agreed to defer. Porter Aff., ¶33.

27. In an October 1, 2003 letter, GE Capital claimed that the Debtor had failed to pay the August 2003 installment and that because of that default the entire amount of the loan, plus interest and late fees was now due. Porter Aff., ¶5 and Ex. 11.

28. GE Capital was wrong. The Debtor had timely paid the August 2003 installment, as the Debtor's Acting CFO explained to GE Capital's attorney in an October 2, 2003 letter. Porter Aff., ¶36 and Ex. 12.

29. GE Capital continued to insist that the Debtor was in default and in an October 6, 2003 letter stated that it would pursue repossession if it did not receive alleged late payments and "accumulated late charges" by October 15, 2003. Porter Aff., ¶37 and Ex. 13.

30. The Debtor could not continue in business without its equipment and machinery. To protect its interests, therefore, the Debtor had no alternative but to seek

protection under the bankruptcy laws. It filed a chapter 11 petition on October 13, 2003. On October 23, 2003, the Debtor proposed a plan of reorganization that called for payment of 100% payment to all unsecured creditors, with interest. As part of the plan, the Debtor also proposed to pay the principal balance due under the loan at issue in this case in full, with interest. Wells Fargo, a participating lender in the loan at issue, has not opposed the plan. GE Capital has opposed it. Porter Aff., ¶38.

Facts Concerning the Personal Property Lease

31.     The equipment that is the subject of the personal property lease under which GE Capital seeks payment is used in the Debtor's cardboard manufacturing process. It determines the thickness and moisture content of paper manufactured by the Debtor. Porter Aff., ¶40.

32.     The equipment has never been used by Creative Packaging and was never intended to be used by Creative Packaging. Creative Paper is a paper and cardboard manufacturer. Creative Packaging, a box manufacturer, would have no use for this kind of equipment. Porter Aff., ¶41.

33.     All correspondence and proposals from the supplier of the equipment, Measurex Systems, Inc. ("Measurex"), before and after the date the equipment was supplied, was addressed to managers of Creative Paper, Inc. Copies of some of these documents, including a 1996 lease proposal, invoices, a notice of merger, a letter concerning late payments, a letter concerning contact information, and a continuing services agreement, are all addressed to Creative Paper. Porter Aff., ¶42 and Ex. 14.

34. In December 1996, before the lease was executed and the equipment delivered, Creative Paper made a down payment for the equipment in the amount of $50,000. Porter Aff., ¶43.

35. The representatives of Measurex have acknowledged to me that they always understood that the equipment was for the exclusive use of Creative Paper, Inc. in its operation of the paper mill.

36. All payments on this lease were made by Creative Paper, Inc., not Creative Packaging. Porter Aff., ¶45.

37. Creative Paper paid GE Capital after GE Capital acquired this lease. Creative Packaging has never made any payment to GE Capital or any other entity under this lease. Porter Aff., ¶46.

38. Although Creative Packaging's name appears on the lease, it is clear from the evidence that all parties, including GE Capital, understood Creative Paper to be the lessee. After Creative Paper filed for bankruptcy, GE Capital observed the automatic stay and took no action to collect on the lease, either from Creative Paper or from Creative Packaging. Porter Aff., ¶47.

Respectfully submitted,

*[signature]*
David Burgess (BBO No. 553783)
9 Damonmill Square, Suite 5C
Concord, MA 01742-2864
978.371.1900

Dated: May 20, 2004

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 5/20/04

*[signature]*

11