UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GENERAL ELECTRIC CAPITAL CORPORATION,<br>                         Plaintiff,<br>v.<br>JAMES E. HAMILTON, RICHARD M. PERLMAN, and CREATIVE PACKAGING, INC.<br>                        Defendants. | CIVIL ACTION NO. 03-CV-12429-MLW |

## AFFIDAVIT OF DAVID PORTER IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

David Porter deposes and states under oath as follows:

1.  I am Acting Chief Financial Officer and Chief Operating Officer of Creative Paper, Inc. and Creative Packaging, Inc. I submit this affidavit in opposition to the GE Capital's motion for summary judgment.

2.  Creative Paper, Inc. (the "Debtor") filed for protection under chapter 11 of the United States Bankruptcy Code on October 13, 2003.

3.  Creative Packaging, Inc. ("Creative Packaging"), the Debtor's affiliate, is not in bankruptcy.

4.  The Debtor and Creative Packaging have their place of business in Worcester, Massachusetts.

5.  The Debtor filed for bankruptcy because of the actions of GE Capital. As a participating lender with Wells Fargo Equipment Finance, Inc. ("Wells Fargo"), the lender with whom the Debtor principally dealt, GE Capital claimed that it was entitled to enforce the loan agreements, even though it was not a party to any agreements with the Debtor, and threatened to take action to enforce the lenders' rights against machinery and

equipment pledged as collateral that was essential to the Debtor's business, as explained in greater detail below.

## The Loan and Guaranty Transactions

6.  I was serving as Acting Chief Financial Officer for the Debtor and Creative Packaging in 1999, when the loan from Wentworth Capital, a division of Charter Financial, Inc. ("Wentworth") at issue in this litigation was negotiated.

7.  The employees of Wentworth who we dealt with in the negotiation of this loan, Sam Smith, James Ferrini, Kerry Flaherty, Gary Nelson, and others, worked at Wentworth's office in Portsmouth, New Hampshire. After Charter Financial, Inc. was acquired by Wells Fargo, we continued to deal with employees of Wells Fargo in Portsmouth.

8.  Although the transaction documents state that Wentworth is a division of Charter Financial, and that Charter Financial is based in New York, no one from New York participated in any aspect of the negotiation of this transaction.

9.  The negotiations for the loan took place in Massachusetts, the closing took place in Massachusetts, the equipment used as collateral is in Massachusetts, the borrower and all of its employees are in Massachusetts, and the persons involved in negotiating the loan and guaranties were in Massachusetts and New Hampshire.

10. The negotiations between the Debtor and Wentworth led to the issuance of a September 28, 1999 commitment letter, a true and correct copy of which is attached as Exhibit 1 hereto.

11. The commitment letter provided for payment of interest at a rate based on the five-year treasury rate. The five-year rate at the time of the commitment letter and at

the time the funds were committed was 5.86%. The agreed rate for the loan was 5% over the five-year rate, 10.86%.

12. Wentworth required Creative Packaging and its principals, Richard M. Perlman and James E. Hamilton, to execute personal guaranties. They complied with this request, and the guaranties are attached to the affidavit submitted in support of GE Capital's summary judgment motion.

13. The monthly installment amounts provided for in the loan schedules did not incorporate the agreed rate of interest, but were determined based on a higher rate. We did not realize this at the time because the loan schedules stated only the dollar amount and not the percentage rate.

14. After I had discovered the discrepancy, I told Wentworth about it and asked for an explanation and for the issue to be resolved. I sent Wentworth a letter about this on March 16, 2000, a copy of which is attached as Exhibit 2.

15. The Debtor paid the monthly installments in the amount stated on the schedules, at the higher rate of interest, reserving the Debtor's rights with respect to this overpayment.

### GE Capital's Interference with the Debtor's Business and Improper Collection Efforts

16. GE Capital announced to us in early 2002 that it had the right to take over from Wells Fargo as the fiscal agent on the loan and that it wanted the Debtor to cure alleged defaults.

17. GE Capital claimed that the Debtor was in default because of its alleged failure to pay late fees that it said were due on many payments between late 1999 and early 2002. Specifically, GE Capital reported that it had not received payment of its

participation amount of the Debtor's monthly installments on time for four months of 2000, eleven months of 2001 and the first two months of 2002. A copy of a payment receipt history and schedule of late charges faxed to me by GE Capital is attached as Exhibit 3.

18. The Debtor was not in default.

19. The Debtor paid its monthly installments on time to Wentworth, as required by the loan documents. The payments were made by automatic bank transfer (referred to as "ACH") for the first 17 months, and then by check thereafter. (The change from ACH to check, beginning in June 2001, was made at the suggestion of Wells Fargo.) The loan documents did not require the Debtor to pay late fees if it made its payments at the time and in the manner required by the loan agreements.

20. The Debtor has no information as to why payments were received or posted late by GE Capital, but this was not because of any delay on the Debtor's part.

21. GE Capital also claimed a default because of a missed installment for April 2001.

22. Although Creative did not pay that installment, its nonpayment was by agreement with Wells Fargo, the fiscal agent at that time, in order to help the Debtor get through a major business interruption.

23. After an April 2001 equipment failure that caused the Debtor's business to be down for 24 days, Wells Fargo agreed that the Debtor could defer payment of the loan installment for the month of April 2001. I negotiated this agreement on behalf of the Debtor with Wells Fargo. A copy of my April 19, 2001 letter to James Ferrini confirming this agreement is attached as Exhibit 4.

24. Wells Fargo's agreement to defer the April 2001 payment is evidenced by its confirmation to the Debtor's independent certified public accountant that the maturity date on the loan was now November 2006. The original maturity date had been October 2006. (With a November 15, 1999 first payment, the 84th payment would be due on October 15, 2006.) A copy of that confirmation is attached as Exhibit 5 hereto.

25. In a January 15, 2002 letter, a copy of which is attached as Exhibit 6, GE Capital claimed, as a result of unspecified defaults, to have designated itself fiscal agent, replacing Wells Fargo.

26. In a January 17, 2002 response, I explained that the Debtor was not in default and that the only installment not paid was the April 2001 installment, which had been deferred by agreement. I attached to the letter a schedule of the payments the Debtor had made. A copy of that letter and schedule are attached as Exhibit 7.

27. GE Capital continued to insist that the Debtor was in default, and on December 11, 2002 made demand for what it claimed was a "past due balance" in the amount of $502,195.90, comprising the April 2001 payment and $391,895.90 in late fees. A copy of that letter is attached as Exhibit 8.

28. In our attempts to work this out with GE Capital, GE Capital has always insisted that these "late fees" must be paid, even though it does not appear to dispute that the Debtor's payments to Wells Fargo were timely.

29. When GE Capital began communicating directly with the Debtor, I asked GE Capital to send me a copy of the participation agreement under which GE Capital claimed (and claims in this action) to have authority to manage collection efforts.

30.   I requested this because we had had a good working relationship with Wells Fargo and would have preferred to continue to deal with that company. Wells Fargo seemed to understand the nature of our business and to want us to succeed. We had never had any dealings with GE Capital, and yet GE Capital was now aggressively and persistently claiming that we had to pay it money we did not owe and that we had no further reason to deal with Wells Fargo.

31.   GE Capital initially refused to show us the participation agreement and continued to refuse to provide it for more than one year. It later relented, but not until after the Debtor had filed for bankruptcy protection and in response to a demand by Debtor's bankruptcy counsel. Copies of the two participation agreements GE Capital faxed to the Debtor's bankruptcy counsel on October 24, 2003, one for the November 1999 loan and one for the December 1999 loan, are attached hereto as Exhibits 9 and 10, respectively.

32.   Under section 3(f) of those Participation Agreements, GE Capital is not entitled unilaterally to take over as fiscal agent and to pursue collection efforts against the Debtor unless the Debtor is in default.

33.   The Debtor was not in default at the time GE Capital purported to take over as fiscal agent. The Debtor had paid its loan installments on time, with the exception of one payment that Wells Fargo had agreed to defer.

34.   I explained the situation to GE Capital repeatedly, but GE Capital continued to insist that the Debtor had to pay late fees that were not owed.

35.   In an October 1, 2003 letter, GE Capital claimed that the Debtor had failed to pay the August 2003 installment and that because of that default the entire amount of

the loan, plus interest and late fees was now due. A copy of that letter is attached as Exhibit 11.

36.  GE Capital was wrong. The Debtor had timely paid the August 2003 installment, as I explained to GE Capital's attorney in an October 2, 2003 letter, a copy of which is attached as Exhibit 12.

37.  GE Capital continued to insist that the Debtor was in default and in an October 6, 2003 letter, a copy of which is attached as Exhibit 13, stated that it would pursue repossession if it did not receive alleged late payments and "accumulated late charges" by October 15, 2003.

38.  The Debtor could not continue in business without its equipment and machinery. To protect its interests, therefore, the Debtor had no alternative but to seek protection under the bankruptcy laws. It filed a chapter 11 petition on October 13, 2003. On October 23, 2003, the Debtor proposed a plan of reorganization that called for payment of 100% payment to all unsecured creditors, with interest. As part of the plan, the Debtor also proposed to pay the principal balance due under the loan at issue in this case in full, with interest. Wells Fargo, a participating lender in the loan at issue, has not opposed the plan. GE Capital has opposed it.

## The Personal Property Lease

39.  The equipment that is the subject of the lease is used in the Debtor's cardboard manufacturing process. It determines the thickness and moisture content of paper manufactured by the Debtor.

40.  The equipment has never been used by Creative Packaging and was never intended to be used by Creative Packaging. Creative Paper is a paper and cardboard

7

manufacturer. Creative Packaging, a box manufacturer, would have no use for this kind of equipment.

41. All correspondence and proposals from the supplier of the equipment, Measurex Systems, Inc. ("Measurex"), at and before the date the equipment was supplied, was addressed to managers of Creative Paper, Inc. Copies of some of these documents, including a 1996 lease proposal, invoices, a notice of merger, a letter concerning late payments, a letter concerning contact information, and a continuing services agreement, all addressed to Creative Paper, are attached as Exhibit 14.

42. Creative Paper's records indicate that in December 1996, before the lease was executed and the equipment delivered, Creative Paper made a down payment for the equipment in the amount of $50,000.

43. The representatives of Measurex have acknowledged to me that they always understood that the equipment was for the exclusive use of Creative Paper, Inc. in its operation of the paper mill.

44. I have checked our accounts payable records and have determined that all payments on this lease were made by Creative Paper, Inc., not Creative Packaging.

45. Creative Paper paid GE Capital after GE Capital acquired this lease. Creative Packaging has never made any payment to GE Capital or any other entity under this lease.

46. I believe all parties, including GE Capital, understood Creative Paper to be the lessee. After Creative Paper filed for bankruptcy, GE Capital observed the automatic stay and took no action to collect on the lease, either from Creative Paper or from Creative Packaging.

Signed under penalty of perjury this 18th day of May, 2004,

David Porter

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 5/20/04