UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GENERAL ELECTRIC CAPITAL,      )
CORPORATION                    )
                               )
          Plaintiff,           )          CIVIL ACTION
     v.                        )          NO. 03-12429-JGD
                               )
JAMES E. HAMILTON,             )
RICHARD M. PERLMAN, and        )
CREATIVE PACKAGING, INC.,      )
                               )
          Defendants.          )

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

May 23, 2005

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, General Electric Capital Corporation ("GE Capital"), has brought

this action seeking to recover under loan guaranties executed by the defendants, James E.

Hamilton ("Hamilton"), Richard M. Perlman ("Perlman") and Creative Packaging, Inc.

("Creative Packaging") (collectively, the "Guarantors"), as well as under a separate

contract executed by Creative Packaging.  (First Amended Complaint ("Complaint")

Counts I-IV).  The defendants have raised various defenses and asserted six counter-

claims: reformation of contract (Count I), misrepresentation (Count II), breach of the

implied covenant of good faith and fair dealing (Count III), breach of contract (Count IV),

intentional interference with advantageous business relations (Count V), and violation of Mass. Gen. Laws, ch. 93A (Count VI).

This matter is presently before the court on GE Capital's motion for summary judgment (Docket No. 10) by which GE Capital is seeking the entry of summary judgment[1] in its favor on all of its claims, as well as on the defendants' counterclaims. For the reasons detailed herein, the motion is ALLOWED IN PART and DENIED IN PART. Summary judgment shall enter in favor of GE Capital as to liability only on Counts I-III of its Complaint seeking to recover under the guarantees, and on all the counterclaims. The amount due under the guarantees shall be determined after further proceedings. Further, as detailed herein, GE Capital's motion for summary judgment as to the separate contract executed by Creative Packaging (Count IV) is denied without prejudice. Creative Packaging shall have ten (10) days from the date of this order to file an amended answer and counterclaim alleging mutual mistake. If it fails to do so, GE Capital may renew its motion for summary judgment as to Count IV.

---

[1] In its motion (Docket No. 10), GE Capital moved for summary judgment on all of its affirmative claims, and moved to dismiss or, alternatively, for summary judgment on the defendants' counterclaims. At oral argument, GE Capital agreed that because the parties have asked the court to consider materials beyond the pleadings, the court should treat GE Capital's motion regarding the defendants' counterclaims as one for summary judgment.

## II.  STATEMENT OF UNDISPUTED FACTS[2]

The following facts relevant to the plaintiff's motion are undisputed unless otherwise indicated.

### The Underlying Loan Agreements

On September 28, 1999, Wentworth Capital, a division of Charter Financial, Inc. ("Wentworth" or "Charter"), issued a commitment letter in favor of Creative Paper, Inc. ("Creative Paper"), an affiliate of defendant Creative Packaging.  (DF ¶ 7; Porter Aff. at Ex. 1).  Pursuant to this commitment letter, which was accepted by Creative Paper on September 30, 1999, Charter was to loan Creative Paper $7,500,000.00 at the interest rate of 5% over the five-year treasury rate.  (Id.).  Subsequently, on or about November 1999, Creative Paper entered into the following agreements with "Wentworth Capital, a division of Charter Financial, Inc., 530 Fifth Avenue, New York, NY 10036": (1) a Master Loan

---

[2]  The facts are derived from the following materials: (1) Local Rule 56.1 Statement of Undisputed Material Facts in Support of General Electric Capital Corporation's Motion for Summary Judgment on its Affirmative Claims and Motion to Dismiss or, Alternatively, Motion for Summary Judgment on Defendants' Counterclaims (Docket No. 12) ("PF"), (2) the Affidavit of Frank Sorensen (Docket No. 13) ("Sorensen Aff.") and the Exhibits attached thereto ("Sorensen Aff. at Ex. __"), (3) the defendants' responses to GE Capital's Local Rule 56.1 Statement contained in the first thirty-five numbered paragraphs set forth on pages one through five of the Defendants' Response to Local Rule 56.1 Statement of Undisputed Facts and Statement of Material Facts as to Which There are Genuine Issues to be Tried (Docket No. 19) ("DR"), (4) the defendants' additional facts contained in the numbered paragraphs set forth on pages five through eleven of the Defendants' Response to Local Rule 56.1 Statement of Undisputed Facts and Statement of Material Facts as to Which There are Genuine Issues to be Tried (Docket No. 19) ("DF"), and (5) the Affidavit of David Porter in Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 20) ("Porter Aff.") and Exhibits attached thereto ("Porter Aff. at Ex. __").

and Security Agreement No. 4366 ("Master Loan Agreement"), including a First Rider,

Second Rider and Amendment to the Master Loan Agreement, and (2) a Loan Schedule

01 to the Master Loan Agreement, including an Amendment to Loan Schedule 01.  (PF

¶ 5).  Pursuant to Loan Schedule 01, Charter extended equipment financing to Creative

Paper in the principal amount of $6,500,000, and Creative Paper agreed to repay the loan

in eighty-four monthly installment payments of principal and interest.  (PF ¶ ¶ 6, 7;

Sorensen Aff. at Ex. B).  The defendants object to the amount of the monthly payments

set forth in Loan Schedule 01 and the Amendment thereto, and contend that they were

calculated based on a higher interest rate than the one that Wentworth and Creative Paper

had agreed to in the commitment letter.  (DR ¶¶ 7, 8; DF ¶ 9).

On or about December 24, 1999, Creative Paper and Wentworth entered into Loan

Schedule 02 to the Master Loan Agreement.  (PF ¶ 9, Sorensen Aff. at Ex. D).  Pursuant

to this agreement, Charter advanced to Creative Paper an additional $1 million in

financing and Creative Paper agreed to repay the loan in eighty-four monthly installment

payments.  (PF ¶ 10; Sorensen Aff. at Ex. D).  The defendants contend that the monthly

payments shown in Loan Schedule 02 also reflect a higher interest rate than the rate that

Creative Paper and Wentworth had agreed to in the commitment letter.[3]  (DR ¶ 10; DF ¶ 9).

Both Loan Schedule 01 and Loan Schedule 02 incorporate the terms and conditions of the Master Loan Agreement.  (Sorensen Aff. at Exs. B and D).  The Master Loan Agreement, as amended, contains a list of occurrences that constitute an event of default under the Agreement and allow for the acceleration of all of Creative Paper's loan obligations, thereby making them immediately due and payable.  (Sorensen Aff. at Ex. A ¶ 11).  These occurrences include, among others, the following:

> (a)     [Creative Paper] shall fail to make any payment in respect of the Liabilities[4] within ten (10) days of when due; or
>
> ***
>
> (f)     [Creative Paper] ... shall cease doing business as a going concern, make an assignment for the benefit of creditors, admit in writing its inability to pay its debts as they become due, file a petition commencing a voluntary case under any chapter of Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code"), be adjudicated an insolvent, file a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation,

---

[3]  After discovering the alleged discrepancy between the interest rate agreed upon in the commitment letter and the interest rate incorporated into the installment payments described in the loan schedules, Creative Paper's Chief Financial Officer notified Wentworth, asked for an explanation for the discrepancy and requested that the issue be resolved.  (DF ¶¶ 9, 10).  On March 16, 2000, he wrote to Wentworth regarding the discrepancy.  (Id. ¶ 10). Creative Paper continued to pay the monthly installments, at the higher rate of interest and in the amounts stated on the loan schedules, but it reserved its rights with respect to the alleged overpayments.  (Id. ¶ 11).

[4]  "Liabilities" is defined in the Master Loan Agreement to include the payment and performance of all indebtedness and obligations owing by Creative Paper to Wentworth. (Sorensen Aff. at Ex. A ¶ 3).

> dissolution or similar arrangement under any present or future
> statute, law, rule or regulation ....

(Sorensen Aff. at Ex. A ¶ 11(f) and Amendment thereto).  In addition, the Master Loan

Agreement includes a provision stating that the Agreement "shall in all respects be

governed by and construed in accordance with the internal laws of the State of New

York, including all matters of construction, validity and performance . . . ." (Sorensen

Aff. at Ex. A ¶ 15).

## The Guaranty Agreements

Defendant Creative Packaging (an affiliate of Creative Paper) and its principals,

defendants Hamilton and Perlman, each entered into a Guaranty Agreement with

Wentworth.  (DF ¶ 8; PF ¶¶ 12-14).  As in the loan documents described above, the

Guaranty Agreements refer to Wentworth as "Wentworth Capital, a division of Charter

Financial, Inc." and list Charter's address in New York.  (Sorensen Aff. at Exs. E, F and

G).  Charter accepted the agreements and notified the defendants of its acceptance.  (PF

¶¶ 12-14).  Each defendant's Guaranty Agreement states in pertinent part:

> 1.     *Guaranty of Payment.*  In order to induce Obligee[5] to enter
> into the Agreements[6] and in consideration of $10.00 and other good
> and valuable consideration paid by Obligee to Guarantor, receipt of
> which is hereby acknowledged, Guarantor hereby unconditionally

---

[5]  The term "Obligee" is defined in the Guaranty Agreements as "Wentworth Capital, a division of Charter Financial, Inc., 530 Fifth Avenue, New York, NY 10036."  (Sorensen Aff. at Exs. E, F and G).

[6]  "Agreements" are defined in the Guaranty Agreements as "the equipment leases, purchase money security agreements and/or other agreements ... which have been or will be entered into between Wentworth Capital . . . and Creative Paper ...."  (Sorensen Aff. at Exs. E, F and G).

guarantees to Obligee (a) the due and punctual payment of the Indebtedness[7], when and as the same shall become due and payable whether at maturity or by required prepayment, notice of optional prepayment, acceleration or otherwise ... Such guaranty is an absolute, unconditional, continuing guaranty of payment and not of collectibility, and is in no way conditioned or contingent upon any attempt to collect from [Creative Paper] ... or upon any other condition or contingency. In case [Creative Paper] shall fail to pay punctually any of the Indebtedness, or any premium or interest thereon, when and as the same shall become due and payable, Guarantor will upon demand immediately pay the same to Obligee.

\* \* \*

3.      *Obligations of Guarantor Not Affected.* The obligations of the Guarantor shall remain in full force and effect without regard to and shall not be affected or impaired in any respect by: (a) any assignment, transfer, amendment, modification, rescission or cancellation of or addition or supplement to the Agreements ... (b) the invalidity, illegality or unenforceability of the Agreements ... or (g) any other cause or circumstance whatsoever, including, without limitation, any other act, thing, omission or delay which would or might in any manner or to any extent vary the risk of Guarantor ...

\* \* \*

7.      *Bankruptcy or Insolvency.* Guarantor agrees that if [Creative Paper] or Guarantor should at any time become insolvent ... or if a petition in bankruptcy or any insolvency, liquidation, reorganization, arrangement, readjustment, composition, dissolution or other similar proceeding shall be filed or commenced by, against or in respect of

---

[7] "Indebtedness" is defined in the Guaranty Agreements to include, *inter alia*, the payment and performance of all indebtedness and obligations of Creative Paper to Wentworth Capital "of every kind and description, direct or indirect, primary or secondary, absolute or contingent or due or to become due, whether by acceleration or otherwise ...." (Sorensen Aff. at Exs. E, F and G).

> [Creative Paper] or Guarantor ... the obligations of Guarantor
> hereunder shall remain in full force and effect; and any and all
> obligations of [Creative Paper] and Guarantor to Obligee shall, at the
> option of Obligee, forthwith become due and payable without notice.

(Sorensen Aff. at Exs. E, F and G). The Guaranty Agreements also contain a choice of law provision, which states that the Agreements "shall in all respects be governed by and construed in accordance with the internal laws of the State of New York, without reference to principles of conflict of laws." (Id.)

As noted above, the loan agreements and guarantees specify that the lender is Wentworth, "a division of Charter Financial, Inc., 530 Fifth Avenue, New York, NY 10036," and that the agreements are to be governed by the laws of New York. (Sorensen Aff. at Exs. A, E, F and G). However, no one from New York participated in any aspect of the loan or guaranty negotiations. (DF ¶ 5). Rather, the negotiations for the loans and guaranties, as well as the closing, took place in Massachusetts, where Creative Paper and Creative Packaging have their places of business and where the individual defendant guarantors reside (DF ¶¶ 3, 6; PF ¶¶ 2-4), and in New Hampshire, where the Wentworth employees involved with the transaction were located. (DF ¶¶ 4, 6). In addition, the equipment used as collateral for the loans is located in Massachusetts. (DF ¶ 6).

At some point after the agreements were signed, Charter was acquired by Wells Fargo. Thereafter, Creative Paper continued to deal with Wells Fargo employees in New Hampshire. (DF ¶ 4).

**GE Capital's Participation Interest**

On or about November 19, 1999 and December 31, 1999, GE Capital entered into two Participation Agreements whereby Charter agreed to sell and GE Capital agreed to purchase participation interests in the loan agreements between Wentworth and Creative Paper, including the guaranties relating to the loan agreements.  (PF ¶ 20; Porter Aff. at Exs. 9 and 10).  The Participation Agreements also contain choice of law provisions selecting New York law.  (Porter Aff. at Exs. 9 and 10).

The Participation Agreements state that the rights of servicing, collection and enforcement of the loan agreements "shall be granted to and held by the party designated as Fiscal Agent . . . ."  (Porter Aff. at Exs. 9 and 10, Section 2).  At the time of the execution of the Participation Agreements, the "Seller," i.e. Charter, was the Fiscal Agent.  (Porter Aff. at Exs. 9 and 10, Section 3(b)).  After Wells Fargo acquired Charter, Wells Fargo, as "Seller," became the Fiscal Agent.  (See Porter Aff. ¶ 7; DF ¶¶ 12, 16). Section 3(f) of the Agreements authorizes GE Capital to designate itself as the Fiscal Agent "[u]pon the occurrence of an event of default by [Creative Paper]" and "upon notice by [GE Capital] to [Charter]."  (DR ¶ 22; Porter Aff. at Exs. 9 and 10).  GE Capital contends that it exercised this right on or about December 7, 2001.  (PF ¶ 22).[8]

---

[8]  The defendants deny that GE Capital had the right to become the Fiscal Agent.  See discussion, infra.

9

## The Parties' Dispute Over Loan Payments

Beginning in or around January 2002, GE Capital claimed that Creative Paper had repeatedly failed to make timely payments and was in default for failure to pay late charges.  (See, e.g., DF ¶¶ 12-13, 21-22)  Creative Paper strenuously denied that any of its payments were untimely.  (DF ¶ 14).  GE Capital further claimed that Creative Paper was in default for failure to make a payment in April 2001.  (DF ¶ 15).  For its part, Creative Paper agreed that it had missed the payment, but contended that Wentworth's successor, Wells Fargo, had agreed that the payment could be skipped due to a major equipment failure, and had extended the loan for another month instead.  (DF ¶¶ 16-18).

GE Capital continued to demand payments and late charges which Creative Paper disputed were due.  (E.g., DF ¶¶ 27-29).  According to Creative Paper, faced with threats by GE Capital to repossess is equipment due to the (improperly calculated) overdue debt, Creative Paper "had no alternative but to seek protection under the bankruptcy laws" and it filed a Chapter 11 bankruptcy petition on October 13, 2003.  (DF ¶ 30).  For purposes of the litigation, GE Capital contends that Creative Paper is in default for failing to make a payment due on August 15, 2003 under Loan 01, failing to make a payment due on September 25, 2003 under Loan 02, failing to make payments on either loan since September 25, 2003, and for filing a bankruptcy petition.  (PF ¶¶ 24, 26).  Creative Paper claims that the August and September 2003 payments were made on time.  (DR ¶ 24).

10

**The Personal Property Lease Agreement**

In Count IV of its Complaint, GE Capital is seeking recovery under a Personal Property Lease Agreement dated June 23, 1997 which, by its terms, provides for Creative Packaging's lease of certain equipment from an entity known as Measurex Systems, Inc. (Sorensen Aff. at Ex. I).  The Agreement was assigned to GE Capital on or about June 30, 1998.  (PF ¶ 32).  The parties agree that no payments have been made under the Personal Property Lease Agreement since September 2003.  (PF ¶ 34; Answer (Docket No. 8) ¶¶ 54, 55).  The Personal Property Lease Agreement contains a choice of law provision which provides that "[t]his Lease shall be governed by and construed under the laws of the State of California."  (Sorensen Aff. at Ex. I ¶ 15(g)).

Creative Packaging contends that it is listed as the lessee only due to a mutual mistake, and that Creative Paper is the real party to the Agreement.  (DF ¶¶ 31-37).  Thus, Creative Packaging claims that it is not liable under the Lease, and has asserted various facts in support of its contention that it was improperly named and that GE Capital knew of the mistake.

## III.  ANALYSIS

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

11

judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal citations and quotation omitted). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994) (internal citations and quotations omitted). In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (internal citation omitted).

**B.    Choice of Law**

The court's first task is to determine the controlling law. GE Capital argues that all of the claims relating to the Guaranty Agreements should be analyzed under New York law, which was the law that the parties to the Master Loan Agreement and to the Guaranty Agreements chose to govern their contractual rights. GE Capital further contends that the Personal Property Lease Agreement should be governed by the laws of California consistent with the choice of law provision contained in that contract. The

defendants argue that Massachusetts law should govern all of the claims, including the parties' contract claims and the tort claims asserted in the defendants' counterclaims, because Massachusetts has the strongest connection to the events at issue.

"A federal court sitting in a diversity case must apply the choice of law rules of the forum state." New Ponce Shopping Ctr. v. Integrand Assurance Co., 86 F.3d 265, 267 (1st Cir. 1996). Accordingly, the court must look to Massachusetts' choice of law rules to determine the substantive law to apply to the parties' claims. With respect to the contract claims, "Massachusetts allows contracting parties to choose the applicable law so long as the transaction bears a reasonable relation to the state chosen." Graham v. Malone Freight Lines, Inc., 948 F. Supp. 1124, 1130 (D. Mass. 1996), clarified on reconsideration, 43 F. Supp. 2d 77 (D. Mass. 1997), and aff'd, 314 F.3d 7 (1st Cir. 1999); Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62, 67 (1st Cir. 2005), and cases cited. See also Morris v. Watsco, Inc., 385 Mass. 672, 674-75, 433 N.E.2d 886, 888 (1982) ("this court has . . . acknowledged and given effect to the law reasonably chosen by the parties to govern their rights under contracts"), quoted in Hodas v. Morin, 442 Mass. 544, 550, 814 N.E.2d 320, 324-25 (2004). Therefore, the issue is whether the parties' designation of New York and California was reasonable.

The defendants argue that New York has no substantial relationship to the parties or the transactions, and that the only connection to New York was that the lender, Wentworth, was a division of Charter, a New York company. However, the Master Loan Agreement and the three Guaranty Agreements expressly describe the lender as being

"Wentworth Capital, a division of Charter Financial, Inc., 530 Fifth Avenue, New York, NY 10036," and make no reference to any other location where Wentworth or Charter do business. This court finds that the loan documents' description of the lender as a New York company establishes a reasonable connection between the transaction and the contracting parties' choice of law. See Bertera Chrysler Plymouth, Inc. v. Chrysler Corp., 992 F. Supp. 64, 72 (D. Mass. 1998) (honoring choice of Michigan law in car dealership agreement where defendant manufacturer had its principle place of business in Michigan); Maxwell Shapiro Woolen Co. v. Amerotron Corp., 339 Mass. 252, 257, 158 N.E.2d 875, 878 (1959) (choice of law based on the state of incorporation of a party to a contract is reasonable). Accordingly, the contract claims relating to the Guaranty Agreements and the underlying loan documents will be analyzed under the laws of New York.

For the same reason, the court will honor the contracting parties' choice of California law in evaluating GE Capital's contract claim under the Personal Property Lease Agreement. That Agreement describes the lessor as "Measurex Systems Inc., One Results Way, Cupertino, California 95014." (Sorensen Aff. at Ex. I). The selection of California law, therefore, is reasonable.

The determination of what law controls the defendants' counterclaims for misrepresentation, intentional interference with advantageous business relations and violations of Mass. Gen. Laws ch. 93A requires a different analysis. See Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607, 609-11 (1st Cir. 1993)

14

(choice of law analysis for Chapter 93A claims depends on nature of claims as tort-like or

contract-like); Graham, 948 F. Supp. at 1131 ("Disposition of the substantive choice of

law issues in tort turns on 'the law of the jurisdiction which has the strongest interest in

the resolution of the particular issue presented.'") (quoting Pevoski v. Pevoski, 371 Mass.

358, 360, 358 N.E.2d 416, 417 (1976)); Bergin v. Dartmouth Pharmaceutical, Inc., 326 F.

Supp. 2d 179, 182-83 (D. Mass. 2004) (different choice of law analysis applied to

contract and tort claims).  However, because this court concludes that all of the

defendants' counterclaims are precluded by the Guaranty Agreements under New York

law, the court declines at this time to decide which law should control those claims.

### C.    Claims Relating to the Defendants' Guaranty Agreements and the Underlying Loan Agreements

#### 1.    Standing

The defendants argue that GE Capital lacks standing to enforce the Guaranty

Agreements because it was not a party to those agreements or the underlying loan

agreements, and the Participation Agreements did not authorize GE Capital to assume the

role of Fiscal Agent, with authority to collect the debt, unless Creative Paper was in

default.  The defendants further argue that GE Capital improperly purported to act as

Fiscal Agent although Creative Paper was not in default.  While there are disputed facts

as to whether Creative Paper was in default at the time GE Capital purported to become

Fiscal Agent, the record is clear that the filing of the bankruptcy petition by Creative

15

Paper was an event of default. Therefore, as of the time suit was filed, GE Capital could properly serve as Fiscal Agent and pursue this action.

In order to determine whether GE Capital has a right to enforce the Guaranty Agreements, the court must determine whether GE Capital has an enforceable obligation against the debtor, Creative Paper. See In re Okura & Co. (America), Inc., 249 B.R. 596, 602-03 (S.D.N.Y. 2000) (evaluating whether party to a participation agreement could pursue a claim for payment against the debtor with whom participant had no contractual privity).[9] This requires the court to look to the language of the Participation Agreements. Id. at 603-04. See also Natwest USA Credit Corp. v. Alco Standard Corp., 858 F. Supp. 401, 408, 411 (S.D.N.Y. 1994) (evaluating language of participation agreement to determine whether participant acquired a direct claim against the borrower).

As a general statement, "[a] participation is not a loan," rather it "is a contractual agreement between a lender and a third party whereby the third party, labeled a partici-pant, provides funds to the lender; the lender utilizes the funds to make its loans to the borrower." Id. at 407-08. Since the "participant is not a lender to the borrower," it "has

_____

[9] The parties do not dispute that New York law applies in construing the Participation Agreements, as provided by the terms of those Agreements.

16

no contractual relationship with the borrower." Id. at 408.  Thus, the mere fact that GE

Capital is a signatory to the Participation Agreement does not give it the right to collect

funds from the debtor or guarantors.

In the instant case, only the "Fiscal Agent" under the Master Loan Agreement and

amendments thereto is responsible for the "servicing, administration, and collection" of

amounts due from Creative Paper.  (Porter Aff. at Exs. 9 and 10, Sections 2 and 3).

Under the Participation Agreements, GE Capital may designate itself as the Fiscal Agent

"[u]pon the occurrence of an event of default by [Creative Paper]."  (Porter Aff. at Exs. 9

and 10, § 3(f)).  Accordingly, GE Capital's right of enforcement against Creative Paper,

and its right to pursue the defendant Guarantors, depends upon whether there has been

"an event of default."

The Master Loan Agreement, which is incorporated into Loan Schedules 01 and

02, defines "events of default" to include Creative Paper's failure to make any of its

payment obligations under the Loan Schedules within ten days of its due date, as well as

the filing by Creative Paper of  "a petition commencing a voluntary case under any

chapter of Title 11 of the United States Code entitled 'Bankruptcy.'" (Sorensen Aff. at

Ex. A ¶ 11(f)).  Although the defendants have submitted sufficient evidence to demon-

strate a genuine issue of disputed fact as to whether Creative Paper was in default for

tardy or missed payments, there is no dispute that on October 13, 2003, Creative Paper

filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Pursuant to

the plain language of the Master Loan Agreement, this filing constituted an event of

17

default.  See Slatt v. Slatt, 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 1100 (1985) ("Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used.").  Therefore, by the time suit was filed, GE Capital had authority to act as Fiscal Agent under the Participation Agreements and standing to enforce the loan agreements and guaranties.  Thus, the defendants' claim that GE Capital lacks standing to maintain this action must fail.

### 2.  Defendants' Ability to Assert Defenses and Counterclaims

GE Capital argues that it is entitled to summary judgment on its claims to enforce the Guaranty Agreements because Creative Paper's default caused all of the company's loan obligations to become accelerated and immediately due and payable pursuant to the Master Loan Agreement and the Guaranty Agreements.  See Pl.'s Memo. (Docket No. 11) at 4-5.  Again, while there are disputed facts as to whether Creative Paper made the payments GE Capital asserts it missed, there is no dispute that Creative Paper filed for bankruptcy protection and that this constituted an event of default.  Under the Master Loan Agreement, Creative Paper's default allowed for the acceleration of all of its loan obligations, thereby making them immediately due and payable.  Under the Guaranty Agreements, the defendants are responsible for all such obligations that have not been paid by Creative Paper.

In addition, under paragraph 7 of the Guaranty Agreements, the obligations of Creative Paper were separately accelerated and became due and payable by the defendant Guarantors when Creative Paper filed for bankruptcy.  Thus, Paragraph 7 of the Guaranty

18

Agreements states that "if a petition in bankruptcy . . . shall be filed or commenced by, against or in respect of [Creative Paper] . . . the obligations of Guarantor hereunder shall remain in full force and effect; and any and all obligations of [Creative Paper] and Guarantor to Obligee shall, at the option of Obligee, forthwith become due and payable without notice." (Sorensen Aff. at Exs. E, F and G). The plain language of the Guaranty Agreements compels the conclusion that the defendants are liable under their Guaranty Agreements due to Creative Paper's bankruptcy filing.

Nevertheless, the defendants argue that they are entitled to raise defenses and counterclaims disputing Creative Paper's liability under the loan agreements and consequently the defendants' obligation to pay under the Guaranty Agreements. See Defs.' Memo. (Docket No. 18) at 9-12. GE Capital counters that the counterclaims are precluded by New York law, and that they each fail to state a claim. Pl.'s Memo. at 6. This court finds that the defendants are precluded from asserting their defenses and counterclaims under New York law. Therefore, summary judgment shall enter in favor of GE Capital as to liability only on Counts I-III of the Complaint.

The Guaranty Agreements at issue in this case are absolute and unconditional. Specifically, each Agreement states that the "Guarantor hereby unconditionally guarantees . . . the due and punctual payment" of Creative Paper's obligations under the loan agreements, "when and as the same shall become due and payable whether at maturity or by required prepayment, notice of optional prepayment, acceleration or otherwise . . . ." The Agreements further state that "[s]uch guaranty is an absolute,

19

unconditional, continuing guaranty of payment, " and that "[t]he obligations of the

Guarantor shall remain in full force and effect without regard to and shall not be affected

or impaired in any respect by . . . any other cause or circumstance whatsoever, including,

without limitation, any other act, thing, omission or delay which would or might in any

manner or to any extent vary the risk of the Guarantor . . . ."  (Sorensen Aff. at Exs. E, F

and G).  "Absolute and unconditional guaranties such as those executed by defendants are

consistently upheld by New York courts" and "have been held to foreclose, as a matter of

law, guarantors from asserting any defenses or counterclaims."  First New York Bank for

Bus. v. DeMarco, 130 B.R. 650, 654 (S.D.N.Y. 1991).  Under "New York law, a

guarantee agreement is separate and distinct from the contract between lender and

borrower, and thus a party who enters into an unconditional guarantee of payment may

not assert setoffs or defenses which arise independently from the guarantee."  Marcus

Dairy, Inc. v. Jacene Realty Corp., 225 A.D.2d 528, 528-29, 638 N.Y.S.2d 779 (2d Dept.

1996), and cases cited.  See also In re Boco Enterprises, Inc., 204 B.R. 407, 415

(S.D.N.Y. 1997) ("New York courts recognize and enforce absolute and unconditional

guarantees which specifically preclude guarantors from asserting any defenses . . . or

counterclaims"), and cases cited; European American Bank v. Lofrese, 182 A.D.2d 67,

73, 586 N.Y.S.2d 816, 819 (2d Dept. 1992) ("Having undertaken such a broad guarantee

'absolutely and unconditionally' [defendant] waived any defenses and/or counterclaims

he might have had"); Citibank, N.A. v. Plapinger, 66 N.Y.2d 90, 95, 485 N.E.2d 974, 977

(1985) (foreclosing defendant guarantors' defenses and counterclaims where defendants

denominated their guarantee obligation as "absolute and unconditional").  Consequently,

the defendants cannot assert their defenses and counterclaims as a matter of law.

Moreover, the claims that the Guarantors are attempting to assert belong to

Creative Paper itself, "and defendants, as guarantors, lack standing to assert them as

either defenses or counterclaims."  DeMarco, 130 B.R. at 655 (guarantors may not assert

counterclaim that bank's conduct in actively managing the debtor company led to the

company's bankruptcy — claims belong to the company).  Thus, the Guarantors are

seeking to reform the underlying Note executed by Creative Paper because it purportedly

does not contain the interest rate previously agreed to by Creative Paper (Counterclaim at

Count I).  They similarly base their misrepresentation counterclaim on statements

allegedly made by the lender concerning the interest rate which would be provided for in

Creative Paper's Note.  (Id. at Count II, ¶ 28).  The other counterclaims for breach of the

implied covenant of good faith and fair dealing (Count III), breach of contract (Count IV),

interference with advantageous relations (Count V), and violation of Mass. Gen. Laws

ch. 93A (Count VI), challenge either the interest rate in the Note or GE Capital's

allegedly unwarranted demands for late payments from Creative Paper, which eventually

resulted in Creative Paper's bankruptcy.  (See, e.g., Counterclaim at ¶¶ 22-23).[10]  These

claims belong to Creative Paper, and are not properly raised by the defendant Guarantors

---

[10]  While the precise bases for the remaining counterclaims are undefined, the allegedly
wrongful conduct identified in the "Facts" section of the counterclaim consists of including a
different interest rate in the Note than agreed upon in the commitment letter (e.g., ¶¶ 10-14), and
the wrongful demand for late fees which eventually led to the bankruptcy filing.  (E.g., ¶¶ 15-23).

by way of defense or counterclaims.  See, e.g., Lofrese, 182 A.D.2d at 73, 586 N.Y.S.2d

at 819 ("A defendant who has been sued as a guarantor or surety cannot avail himself, in

exoneration of his liability, of a cause of action to recover damages for breach of the

contract with his principal"), and cases cited.

The defendants rely on Nat'l Westminster Bank USA v. Ross, 676 F. Supp. 48

(S.D.N.Y. 1987), in support of their argument that they should be allowed to proceed

with their defenses and counterclaims.  However, Ross is inapplicable to the instant case.

In Ross, the defendant guarantor was seeking to bring a counterclaim to the effect that the

bank altered the terms of a loan agreement after it had been executed without the consent

of the guarantor.  Id. at 52-52.[11]  Relying on the principle that "[a]ny alteration in [a] loan

made without the consent of the guarantor, whether or not material, operates as a

discharge," the court held that by asserting that the loan agreement had been altered, the

guarantor had "put forth factual allegations which go to the heart of plaintiff's ability to

recover under the guarantee agreement."  Id. (internal quotations omitted).

The alleged result of these modifications of the loan agreement in Ross was to put

the borrower company in turmoil and to destroy its business.  The guarantor sought to

raise this claim through various counterclaims.  The court, recognizing that the language

---

[11]  The Ross court recognized that "[t]he relationship between a guarantor and a lender is
contractual in nature and defined by the contract of guarantee."  676 F. Supp. at 51.  Therefore, it
appears that the guaranty agreement at issue did not preclude the guarantor from asserting this
defense.  Compare In re Boco Enterprises, Inc., 204 B.R. at 415 ("A guarantor may also consent
in advance to the continued viability of its guaranty notwithstanding modification to the
underlying agreement").

of the guaranty precluded the maintenance of counterclaims, nevertheless allowed the

counterclaims to proceed.  As the court held:

> [u]nder New York law, "[w]hile it is not violative of public policy to
> enforce waiver of the right to interpose counterclaims, nonetheless
> defenses based upon allegations of fraud may not be waived.  This is
> because a written waiver in any form cannot operate to shield a party
> from his own fraud.  For the courts to give effect to such a clause
> would be violative of both public policy and morality, since an
> ultimate finding of fraud must of necessity vitiate the contract relied
> upon."

Id. at 53-54 (quoting Sterling Nat'l Bank & Trust Co. of New York v. Giannetti, 53

A.D.2d 533, 384 N.Y.S.2d 176, 177 (1st Dep't 1976)) (emphasis added).

In the instant case, as an initial matter, the Guarantors are not claiming that the

loan agreements were modified without their consent and have not asserted claims "which

go to the heart of plaintiff's ability to recover under the guarantee agreement."  Even

more importantly, the defendants have not brought any counterclaims for fraud and have

not asserted claims which would "vitiate the contract relied on."  At issue in the instant

case is whether GE Capital applied the appropriate interest rate and whether it properly

claimed that late charges were due.  However couched, these are contract claims which, if

brought by the company, might at most result in a reformation of the contract along with

damages — nothing asserted herein would render the underlying agreements void.  Under

such circumstances, it would not be "violative of both public policy and morality" to

enforce the express terms of the Guaranty Agreements which preclude the maintenance of

counterclaims by the Guarantors.  The principle enunciated in Ross has no application

here, and therefore, summary judgment shall issue in favor of the plaintiff on Counts I-III

of the Complaint as to liability.[12]

### 3.    Damages

Although this court finds that GE Capital is entitled to summary judgment with

respect to the defendants' liability under the Guaranty Agreements and on the defendants'

counterclaims, this court further finds that there are disputed issues of fact precluding

summary judgment in favor of the plaintiff on the issue of damages.  The Guaranty

Agreements support GE Capital's position that all of Creative  Paper's obligations under

the loan documents became due and payable by the defendant guarantors when Creative

Paper filed for bankruptcy.  According to GE Capital, the amount of Creative Paper's

unpaid obligations, exclusive of GE Capital's reasonable attorneys' fees and costs, is

$4,153,801.  Pl.'s Memo. at 5; Sorensen Aff. ¶ 24.  However, the plaintiff has not pro-

vided information as to how it calculated this amount or whether the figure incorporates

allegedly missed payments or any late fees.  As described above, there are disputed issues

of fact as to whether or not Creative Paper made all the monthly payments and whether

late fees are due.  Consequently, summary judgment shall enter in favor of GE Capital on

liability only.  See DeMarco, 130 B.R. at 656 (absent proof of "the debts paid and those

---

[12]  Because of this conclusion, this court declines at this time to address the plaintiff's
argument that each of the causes of action alleged in the defendant's counterclaim fails to state a
claim.

remaining," summary judgment entered in favor of lender on the issue of liability only in suit to enforce guarantees).

Under the Guaranty Agreements, the Guarantors are liable for amounts "due and payable" under Creative Paper's loan agreements.  (Sorensen Aff. at Exs. E, F and G, ¶ 1).  The burden is on the plaintiff to establish the amounts due.  While the Guarantors may not seek to reform the contracts, they may challenge GE Capital's contention that payments were missed or were untimely.  See Marcus Dairy, Inc., 225 A.D.2d at 529, 638 N.Y.S.2d at 780 (guarantors entitled to credit "for payments actually made under the guaranteed notes").  The procedure for establishing the amount due under the Guaranty Agreements shall be established at the next status conference.

**D.    Claim for Breach of the Personal Property Lease Agreement**

GE Capital argues that it is entitled to summary judgment against defendant Creative Packaging on its claim for breach of the Personal Property Lease Agreement (Complaint at Count IV) because Creative Packaging was the named lessee in the contract and it agrees that no payments have been made under that agreement since September 2003.  Creative Packaging urges the court to deny GE Capital's motion on the grounds that Creative Packaging was named as the lessee under the Personal Property Lease Agreement as a result of a scrivener's error, and that the contracting parties, as well as GE Capital, understood that Creative Paper was the intended lessee under the Agree-ment.  In other words, Creative Packaging is seeking to avoid liability on the grounds of mutual mistake.  While mutual mistake is a defense under California law, it has not been

pleaded by Creative Packaging. Therefore, the motion for summary judgment shall be denied without prejudice. Creative Packaging shall be granted leave to file an amended answer and counterclaim asserting the defense of mutual mistake. If it fails to do so within ten (10) days of the date of this order, GE Capital may renew its motion for summary judgment as to Count IV.

Ordinarily, "[i]f contractual language is clear and explicit, it governs." Bank of the West v. Superior Court of Contra County, 2 Cal. 4th 1254, 1264, 833 P.2d 545, 552, 10 Cal. Rptr. 2d 538, 545 (1992). In this case, the Personal Property Lease Agreement clearly and explicitly names Creative Packaging as the lessee under the Agreement. Nevertheless, Creative Packaging has submitted evidence indicating that it was the intention of the contracting parties that Creative Paper, not Creative Packaging, be the entity to lease equipment from Measurex, and that the contracting parties mistakenly named Creative Packaging as the lessee on the written contract.

Under California law, "[t]he parol evidence rule generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument because [such evidence] cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself." Pacific State Bank v. Greene, 110 Cal. App. 4th 375, 378-79, 1 Cal. Rptr. 3d 739, 742 (3rd Dist. 2003) (internal quotations and citations omitted). See also Casa Herrera, Inc. v. Beydoun, 32 Cal. 4th 336, 346, 83 P.3d 497, 504, 9 Cal. Rper.3d 97, 104 (2004) ("The parol evidence rule establishes that an integrated written agreement *supersedes* any prior

or contemporaneous promise at variance with the terms of that agreement.").  However,

the rule, which is codified in section 1856 of the California Code of Civil Procedure,

provides a number of statutory exceptions, including an exception for mistake.  See

Greene, 110 Cal. App. 4th at 383-84, 1 Cal. Rptr. 3d at 745-46.  Specifically, § 1856(e)

provides: "Where a mistake or imperfection of the writing is put in issue by the pleadings,

this section does not exclude evidence relevant to that issue."  Cal. Code Civ. P.

§ 1856(e).  Accordingly, "[t]o raise mutual mistake as a defense, the aggrieved party does

not have to ask for a reformation of the contract or have the same reformed.  The party

need only allege and prove mutual mistake in order to avoid enforcement of the erroneous

terms."  Hess v. Ford Motor Co., 27 Cal. 4th 516, 525, 41 P.3d 46, 52, 117 Cal. Rptr. 2d

220, 227 (2002) (internal quotations and citations omitted).

        In the instant case, the defendants have raised the defense of mistake in their

opposition to the plaintiff's motion for summary judgment.  However, there is nothing in

their answer or counterclaims sufficient to put GE Capital on notice that they were

claiming mistake or that could even be construed as raising the issue at all.  Compare

Greene, 110 Cal. App. 4th at 382, 388-89, 1 Cal. Rptr. 3d at 744, 748-49 (extrinsic

evidence of mistake admissible where defendant guarantors raised affirmative defense of

mistake in their answer).  GE Capital did not and was not obligated to respond to the

defendants' opposition to the motion for summary judgment.  Consequently, the extent of

the factual dispute about the proper party to the Personal Lease Agreement is unclear.

## IV.  CONCLUSION

For all the reasons stated herein, GE Capital's Motion for Summary Judgment (Docket No. 10) is ALLOWED IN PART and DENIED IN PART as follows.  GE Capital is entitled to summary judgment with respect to the defendants' liability under the Guaranty Agreements (Counts I-III of the First Amended Complaint) and with respect to all counts of the defendants' counterclaim.  However, there are disputed issues of material fact precluding the entry of summary judgment in favor of GE Capital with respect to the damages that GE Capital is seeking from the defendants under the Guaranty Agreements.  The parties will address the procedure to be followed in establishing the amount of the debt at the next status conference.

GE Capital's motion for summary judgment on Count IV of the First Amended Complaint is denied without prejudice.  Creative Packaging may file an amended answer and counterclaim asserting the defense of mutual mistake within ten (10) days of the date of this Order.  If it fails to do so, GE Capital may renew its motion for summary judgment as to Count IV.


_____ / s / Judith Gail Dein_____
Judith Gail Dein
United States Magistrate Judge